UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

VICTOR MRAZ,

        Plaintiff,

v.                                      Case No. 2:18-cv-254-FtM-38NPM

I.C. SYSTEMS, INC.,

        Defendant.

_____

**REPORT AND RECOMMENDATION**

Before the Court are Plaintiff's Renewed Motion for Costs and Attorneys' Fees (Doc. 71), Plaintiff's Request for Judicial Notice (Doc. 82), and Plaintiff's Motion for Sanctions Pursuant to 28 U.S.C. § 1927 (Doc. 96). Having obtained a consent judgment in his favor and then successfully resisting multiple efforts to vacate that judgment, Plaintiff Victor Mraz requests an award of $116,845.00 for fees and $1,366.79 for costs. (Docs. 71, 91). With entitlement to fees uncontested, and with no objection to the requested amount for costs, Defendant I.C. Systems, Inc. ("ICS") argues in response that the fee award should be limited to $22,596.00. (Doc. 101).

For the reasons discussed below, the Court should deny Mraz's motions for judicial notice and for section 1927 sanctions, and it should award him $72,651.50 for fees and $1,366.79 for costs.

## I.      Factual and Procedural Overview

This Fair Debt Collection Practices Act ("FDCPA") case arises from a single debt collection letter ICS sent to Mraz because a doctor mistakenly charged Mraz a $50 cancellation fee. (Doc. 1; Doc. 33, pp. 1-2).[1] The letter contained a misstatement; Mraz disputed the validity of the debt; the creditor confirmed no balance was due; and ICS ceased all efforts to collect. Still, Mraz decided to sue, and ICS chose to aggressively litigate the matter. In fact, ICS went so far as to contend that it is not a debt collector. (Doc. 33, p. 4).[2] But in the end, the Court summarily rejected ICS's only defense and found ICS liable on all counts. (Doc. 33).

Then, the parties notified the Court that Mraz accepted ICS's Rule 68 offer of judgment for $1,001 in damages and a reasonable amount of fees and costs as determined by the Court. (Doc. 36). The Court entered judgment in favor of Mraz and reserved jurisdiction to determine the fee-and-cost award. (Docs. 38, 39). In response to Mraz's first motion for fees and costs (Doc. 41), a previous report and recommendation (Doc. 53) reasoned that the motion should be granted in part and denied in part. Both sides lodged objections (Docs. 54, 55). Before the Court ruled

---

[1] Pages are cited according to the number generated by CM/ECF.

[2] Notably, this Court has repeatedly held ICS liable—as a debt collector—for violations of the FDCPA. *See*, *e.g.*, *Bishop v. I.C. Sys., Inc.*, 713 F. Supp. 2d 1361 (M.D. Fla. 2010); *Oppenheim v. I.C. Sys., Inc.*, No. 8:09-CV-497-JDW-TGW, 2010 WL 11628820 (M.D. Fla. July 27, 2010); *see also Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1273-74 (11th Cir. 2011) (observing that ICS is a debt collector for purposes of the FDCPA).

on the objections to the R&R, ICS filed a motion to dismiss for lack of subject matter jurisdiction. (Doc. 57). Consequently, the Court denied without prejudice Mraz's initial motion for fees and costs. (Doc. 59). And some months later, the Court denied ICS's post-judgment motion to dismiss. (Doc. 70).

Mraz renewed his motion for fees and costs (Doc. 71). But before responding to the motion, ICS filed a motion for reconsideration of the Court's order denying the motion to dismiss. (Doc. 86). The Court denied reconsideration (Doc. 89). With this Court's leave (Doc. 90), Mraz supplemented his motion for fees and costs to account for the additional expenses (Doc. 91).

## II.    Mraz's Request for Judicial Notice

Even though it is cited no less than ***eighteen*** times in the various papers filed in support of Mraz's renewed motion for fees and costs, and a copy is even attached as an exhibit to the renewed motion (Doc. 71-2), Mraz requests that the Court take judicial notice of its prior disposition of a fee-and-cost motion in another FDCPA case handled by his counsel; namely, Judge Mirando's R&R in *Robinson v. Nat'l Cred. Sys., Inc.*, No. 2:17-cv-386-FtM-38CM, 2019 WL 468580 (M.D. Fla. Jan. 22, 2019), which—in the absence of any objection from the parties—was adopted as an order of the Court, 2019 WL 462979 (Feb. 6, 2019). At bottom, Mraz wants the Court to take judicial notice that two of his three attorneys obtained a fee award in Fort Myers that was based on an hourly rate of $425. (Doc. 82).

Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of certain adjudicative facts. "[A]djudicative facts are those to which the law is applied in the process of adjudication. They are the facts that normally go to the jury in a jury case. They relate to the parties, their activities, their properties, their businesses." Fed. R. Evid. 201 (1972 Advisory Committee Notes). In other words: "When a court or an agency finds facts concerning the immediate parties—who did what, where, when, how, and with what motive or intent—the court or agency is performing an adjudicative function, and the facts are conveniently called adjudicative facts." *Id*.

But an adjudicative fact is, generally speaking, "a fact in issue or facts from which such fact may be inferred." *Grayson v. Warden, Comm'r, Alabama Doc*, 869 F.3d 1204, 1224 n.48 (11th Cir. 2017) (citing 18 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 5103.3 (3d ed. 2016)). And there is no dispute that, in the absence of any objection, the Court found $425 to be a reasonable hourly rate for the work that attorneys David Fineman and Joseph LoTempio performed in *Robinson*. Thus, even if the rate upon which a fee award was granted in another case could constitute an adjudicative fact, the hourly rate utilized in *Robinson* is not in issue and taking judicial notice of it is entirely unnecessary.

Moreover, the reasonable hourly rate arrived at in *Robinson* was a legal

conclusion, and the "decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (citing 18 J. Moore, et al., MOORE'S FEDERAL PRACTICE § 134.02[1] [d] (3d ed. 2011)); *see also McCray v. Dietsch and Wright, P.A.*, No. 8:18-cv-731-T-02SPF, 2020 WL 6565078, *2 (M.D. Fla. Nov. 9, 2020) ("That any counsel in FDCPA [class action] cases have been awarded $450 per hour by courts in this district does not bind this Court in this case."). Indeed, it would be inappropriate for a district court to rest its conclusion about a reasonable hourly rate on little more than a prior determination because a reasonable rate—even for the same attorney handling the same type of action in the same market—is a client-by-client and case-by-case determination. *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1300 (11th Cir. 1988) ("No two lawyers possess the same skills, and no lawyer always performs at the same level of skill."). Worse yet, such limited reasoning could be all too circular. *City of Burlington v. Dague*, 505 U.S. 557, 564 (1992) ("Our decrees would follow the 'market,' which in turn is based on our decrees."); *see also Dillard v. City of Greensboro*, 213 F.3d 1347, 1355 (11th Cir. 2000) ("Prior awards are not direct evidence of market behavior.").

It was enough to cite *Robinson* and discuss it in the renewed motion, and to even note that *Robinson* was not discussed in the prior report and recommendation

issued in response to Mraz's initial fee-and-cost motion (more on that later), but it was overkill to cite *Robinson* nearly twenty times in support of the renewed motion, and all the more improper to supply copies of Judge Mirando's R&R and the order adopting it. *Cf.* M.D. Fla. R. 3.01(i) (providing that a notice of authority "must not include a copy of the authority unless the authority is not readily available"). Crassly emphasizing *Robinson* by going even further and requesting judicial notice has unreasonably multiplied this proceeding and thereby wasted the limited resources of the Court. The request for judicial notice should be denied.[3]

## III.   Mraz's Request for Sanctions Under 28 U.S.C. § 1927

Coming on the heels of his inadvisable request for judicial notice, and so somewhat reminiscent of "the pot calling the kettle sooty," Mraz argues that defense counsel vexatiously multiplied this proceeding by filing the post-judgment motion to dismiss and the motion for reconsideration of the Court's refusal to dismiss. (Doc. 96).

Section 1927 provides: "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably

---

[3] Tellingly, plaintiff counsel do not seek an award of fees for time spent preparing the request for judicial notice. Instead, their timesheets report "0.0 hours" for each time entry related to this filing. (Doc. 91-1, p. 1).

incurred because of such conduct." 28 U.S.C. § 1927. This statute imposes a "high standard" that requires the movant to make an objective showing that the other side acted in bad faith. *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020).

While evidence of subjective bad faith may be used as support, the objective showing is made by demonstrating the other side engaged in behavior that "grossly deviates from reasonable conduct." *Id.* (citing *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239-1241 (11th Cir. 2007)). Such a deviation requires more than mere negligence; it usually means an attorney acted knowingly or even recklessly. *Id.*; *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003). Thus, an attorney acts in bad faith under section 1927 when he "knowingly or recklessly pursues a frivolous claim," or if he "argues a meritorious claim for the purpose of harassing an opponent." *Silva v. Pro Transp., Inc.*, 898 F.3d 1335, 1340 (11th Cir. 2018); *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1225 (11th Cir. 2017). Sanctions under section 1927 are "a strong medicine used sparingly"; they require "more than a lack of merit … or [else] they would be due in every case." *Caiazza v. Marceno*, No. 2:18-cv-784-SPC-MRM, 2021 WL 1193166, *1 (M.D. Fla. Mar. 30, 2021) (Chappell, J.) (internal citations omitted).

Mraz sticks to the former theory—that ICS's attorneys acted in bad faith in pursuing the motion to dismiss and the motion for reconsideration. (Doc. 96, pp. 9-17). Both parties present starkly different stories to support their respective

positions—another sign of how contentious this litigation has been from the start. But the rub for Mraz is this: if these two motions were frivolous—that is, they were so devoid of merit that the Court could have summarily rejected them out of hand—then how does his counsel's successful opposition demonstrate exceptional skill,[4] and why was it necessary for such ostensibly talented lawyers to pour dozens of hours into mounting a successful opposition?[5] Seems professional judgment informed by years of experience would have counseled against the filing of the section 1927 motion so as to avoid calling the arguments in support of the fee-and-cost motion into doubt; especially since entitlement to fees is uncontested and the relief sought in the section 1927 motion—an award of fees—is duplicative of the fee-and-cost motion.[6] Sometimes the best argument is the one not made.

To Mraz's benefit for purposes of his fee-and-cost motion, ICS's post-judgment motions were not frivolous. The motion to dismiss for lack of subject matter jurisdiction was based on the Eleventh Circuit's new decision about standing in FDCPA cases, *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990 (2020). As

---

[4] Mraz argues in support of his renewed motion for fees and costs: "ICS's post-judgment attack was denied thanks to the exceptional efforts of Plaintiff's counsel." (Doc. 71, p. 9).

[5] Mraz further agues in his fee-and-cost motion: "ICS['s] … aggressive litigation of this matter post-settlement [and] post-judgment … caused Plaintiff's fees to nearly *double* in order to safeguard the judgment." (Doc. 71, p. 6 (emphasis in original)).

[6] Granting the section 1927 motion would only serve to make defense counsel and their firm liable for *some* of the fee-and-cost award for which ICS would already be liable.

the Court observed in its order denying ICS's motion, *Trichell* brought "the Court's subject matter jurisdiction into question." (Doc. 70, p. 2). In fact, just four days before the filing of ICS's motion to dismiss, the Court had ordered the parties in another FDCPA case with allegations of emotional distress damages (nearly identical to those alleged here) to brief whether the Court had subject matter jurisdiction in light of *Trichell*. *See Lamirand v. Fay Servicing, LLC*, No. 2:20-cv-138-FtM-38MRM, 2020 WL 3895427 (M.D. Fla. July 10, 2020) (Chappell, J.).[7] And as Mraz highlighted in a notice of supplemental authority in opposition to the motion to dismiss, arguments like those advanced by ICS in the motion to dismiss were contemporaneously advanced in another FDCPA case before this Court by a different defendant represented by different counsel. (Doc. 68). Thus, it simply cannot be said that ICS's motion "grossly deviate[d] from reasonable conduct." *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020).

The motion for reconsideration that followed simply underscores the overly aggressive approach adopted by ICS in its defense of this case. About four weeks after the Court denied ICS's post-judgment motion to dismiss, the Eleventh Circuit, sitting en banc, "issued a behemoth opinion on standing" (Doc. 89, p. 2) in *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917 (11th Cir. 2020). This prompted ICS to

---

[7] Notably, Mraz's lead counsel, Joseph LoTempio, also represents the plaintiffs in *Lamirand* and handled the *Trichell* briefing in that matter.

refocus its lack-of-standing argument to be more about the nature by which Mraz's intangible harm was alleged and less about the nature of the harm itself. But as the Court observed when denying reconsideration, *Muransky* did nothing to change the law concerning the pleading standard for standing; rather, "the decision was a simple application and explanation of this Circuit's law on standing in statutory cases." (Doc. 89, p. 2). While the motion for reconsideration lacked merit, that alone is not enough to meet the high bar for imposing section 1927 sanctions. *See Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020); *Caiazza*, 2021 WL 1193166 at *1. Much like Mraz's request for judicial notice, the motion for reconsideration did not cross the line between poor judgment and bad faith. Therefore, Mraz's request for sanctions should be denied.

## IV.    Mraz's Renewed Motion for Fees and Costs

Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt collectors, to [ensure] that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). The FDCPA provides for a civil cause of action to enforce its provisions, with debt collectors who violate the act liable for actual damages, statutory damages up to $1,000, and reasonable attorney's fees and costs. *See Edwards v. Niagara Credit Solutions, Inc.*, 584 F.3d 1350, 1352 (11th Cir. 2009)

(citing 15 U.S.C. § 1692k(a)(1)-(3)). The FDCPA's reasonable fee provision, like many other federal fee-shifting statutes, is governed by the Supreme Court's lodestar precedent. *Moton v. Nathan & Nathan, P.C.*, 297 F. App'x 930, 931 (11th Cir. 2008); *see also City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (reasoning that Supreme Court "case law construing what is a 'reasonable' fee applies uniformly" to federal, prevailing party, fee-shifting statutes).

The lodestar figure is the product of a two step, fact-intensive and case-specific inquiry, asking: (1) what would a lawyer in this division[8] assess a paying client per hour to provide representation comparable to the legal skill, expertise and acumen supplied to the plaintiff in this particular case, and (2) practicing good billing judgment, how many hours would it have been appropriate for the lawyer in this matter to bill such a client for the claim or claims that were successful? *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551-553 (2010); *Dague*, 505 U.S. at 562-567; *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299-1302 (11th Cir. 1988). Because it is objective, predictable, and readily ascertainable, this lodestar inquiry has, as its name suggests, become the guiding light in federal statutory fee-shifting jurisprudence. *Perdue*, 559 U.S. at 551.

---

[8] Fee motions in this district must include "evidence showing the reasonableness of the rates based on the prevailing market rate *in the division in which the action is filed* for similar services by a lawyer of comparable skill, experience, and reputation." M.D. Fla. R. 7.01(c)(4)(F) (emphasis added).

There is a strong presumption that the lodestar method yields a fee sufficient for federal private-right-of-action plaintiffs to obtain competent counsel while not producing windfalls for attorneys. *Id*. at 552. An enhancement simply because the case was taken on contingency is not permitted, *Dague*, 505 U.S. at 566-567, and it would otherwise be exceedingly rare for any enhancement to be appropriate. *Perdue*, 559 U.S. at 552; *see also id.* 561 (Thomas, J., concurring) ("the lodestar calculation will in virtually every case already reflect all indicia of attorney performance relevant to a fee award"). But to avoid economic waste of litigant and judicial resources, downward departures—sometimes substantial—may be appropriate when a plaintiff rejects a reasonable resolution in favor of further, and yet needless, litigation. *See Thornton v. Wolpoff & Abramson, L.L.P.*, 312 F. App'x 161, 163-165 (11th Cir. 2008) (affirming 85% reduction of lodestar in FDCPA case because the defendant offered $3,500 early in the litigation and the jury awarded only $1). Finally, the fee applicant bears the burden of establishing entitlement, documenting appropriate hours, and substantiating reasonable hourly rates. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

## A.    Reasonable hourly rates

As the Eleventh Circuit comprehensively, yet succinctly, explained in *Norman*, 836 F.2d at 1299 (internal citations omitted) (emphasis added):

> A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of

reasonably comparable skills, experience, and reputation. The applicant bears the burden of producing satisfactory evidence that the requested rate is in line with prevailing market rates. Satisfactory evidence at a minimum is more than the affidavit of the attorney performing the work. It should also be noted that in line with the goal of obtaining objectivity, satisfactory *evidence necessarily must speak to rates actually billed and paid in similar lawsuits*. Testimony that a given fee is reasonable is therefore unsatisfactory evidence of market rate. Evidence of rates may be adduced through direct evidence of charges by lawyers under similar circumstances or by opinion evidence. The *weight to be given to opinion evidence* of course will be *affected by the detail* contained in the testimony on matters such as similarity of skill, reputation, experience, similarity of case and client, *and breadth of the sample of which the expert has knowledge*.

"[F]ee rates vary from lawyer to lawyer, case to case, and client to client," and so the parties should provide comparisons to the court of fee-paying relationships that "are relevant to the facts and circumstances of the case, the client, and the attorney before it." *Id.* at 1300. Using a range of market rates for lawyers of different skill levels in similar cases with similar clients, the court may interpolate the prevailing market rate based on an assessment of the skill of the applicant lawyer. *Id.*

All too often, the parties' submissions stake out polar extremes, provide insufficient or no comparisons to fees *actually billed and paid* in the relevant market, and offer inadequate support. But the court "is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of

witnesses as to value." *Id*. at 1303 (quoting *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940)). At bottom: "It is the job of the district court in a given case to interpolate the reasonable rate based on an analysis of the skills … exhibited by the attorney in the case at bar…." *Id*. at 1301.

Turning to the task at hand, Mraz requests an hourly rate of $425 for attorneys Joseph LoTempio, David Fineman, and Carmen Dellutri of The Dellutri Law Group. (Doc. 71, p. 2). LoTempio is an eleven-year attorney who has practiced exclusively in the area of consumer protection and debt defense with a focus on FDCPA cases for nearly ten years. (Doc. 75, ¶ 3). Fineman is a fourteen-year attorney who practices in various areas including bankruptcy, consumer protection, and foreclosure defense. (Doc. 73, ¶¶ 2, 6). Dellutri has been practicing law for nearly thirty years and has been board certified in consumer bankruptcy law by the American Board of Certification since 2005. He has represented thousands of clients in personal injury, bankruptcy, foreclosure defense, and consumer protection cases, and he is a certified trial and appellate mediator for state court matters and a qualified arbitrator. (Doc. 72, ¶¶ 2-4, 12). Given the apparent differences among them in skill, experience, and reputation, Mraz's decision to request the same rate for all three with no explanation for why a fee-paying client would find that appropriate is emblematic of the overall failure to prove a market rate for the services provided.

Furthermore, an overarching flaw in Mraz's hourly-rate argument is that it is

based on outdated criteria (nearly 50 years old) from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974). While Mraz acknowledges that the lodestar method has replaced the *Johnson* factors (Doc. 71, p. 8), he nevertheless cites *Maner v. Linkan LLC*, 602 F. App'x 489, 493 (11th Cir. 2015), for the proposition that courts may still consider them to arrive at a reasonable hourly rate. *Maner*, in turn, cites the Eleventh Circuit's suggestion in 1988 "that *Johnson* factors might be considered in terms of their influence on the lodestar amount." *Norman*, 836 F.2d at 1299. But in the interim, the Supreme Court has unequivocally reasoned that the lodestar method is distinct from, and superior to, the *Johnson* approach. *See Perdue*, 559 U.S. at 550-552 (2010) ("… unlike the *Johnson* approach, the lodestar calculation is objective, and thus cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." (internal quotation and citation omitted)).

The flaw in Mraz's reasoning becomes all the more acute when he argues, based on the *Johnson* factors, that $425 is a reasonable hourly rate for his lawyers in this matter because they work on a contingent-fee basis and need to be awarded a higher-than-market rate to make up for the contingent-fee cases in which they do not prevail. (Doc. 71, p. 17). This notion was squarely rejected nearly thirty years ago in *City of Burlington v. Dague*, 505 U.S. 557 (1992). As the Supreme Court reasoned in *Dague*: "To award a contingency enhancement under a fee-shifting statute would

in effect pay for the attorney's time (or anticipated time) in cases where his client does not prevail." *Id.* at 565. And "just as the statutory language limiting fees to prevailing (or substantially prevailing) parties bars a prevailing plaintiff from recovering fees relating to claims on which he lost, so should it bar a prevailing plaintiff from recovering for the risk of loss." *Id.* (citations omitted). Put simply, an "enhancement for contingency is not permitted." *Id.* at 566.

Moreover, "the affidavits submitted in support of the fee application and the affidavit[] submitted in opposition thereto are by and large inadequate." *Norman*, 836 F.2d at 1304. In support of Mraz's motion, LoTempio drafted and submitted cookie-cutter declarations from local practitioners Marcus Viles, Maria Alaimo, and John Webb.[9] (Docs. 76, 77, 78, 93, 94, 95; *see also* Doc. 75-1, p. 6 (LoTempio's time entries for drafting declarations)). But these declarants do not offer any evidence about "rates actually billed and paid in similar lawsuits." *Norman*, 836 F.2d at 1299. Nor do they offer opinion evidence based on any sample of the fees actually collected from paying clients in potentially comparable matters and the similarity of the case, client, and litigator in each to this action. *Id.* They do nothing more than simply concur with Mraz's contention that $425 would be a reasonable hourly rate for the services provided by his counsel in this case. But as the Eleventh Circuit

---

[9] Two of the three declarants are from the same firm.

instructs: "Testimony that a given fee is reasonable is … unsatisfactory evidence of market rate." *Id*. And with no "mention of prevailing market rates," these declarations "provide[] little or no evidentiary support for an award." *Id*. at 1304.[10]

The declarations from LoTempio, Fineman, and Dellutri likewise fail to supply competent market-based evidence for the lodestar analysis. They generally handle FDCPA cases like this one on a contingent-fee basis. (Doc. 73, ¶ 5). Inexplicably, they claim that they "charge" these contingent-fee clients $425 per hour, but then they admit no fee is charged to the client if they don't recover. *Id*. Thus, while they attempt to characterize these matters as involving a "customary rate" (Doc. 75, ¶ 5), these are not the kind of fee relationships from which lodestar data can be derived.

Furthermore, their references to the "rare circumstance[s]" (Doc. 73, ¶ 5; Doc. 72, ¶ 11) in which actual hourly-fee clients are charged $425 per hour are unhelpful because nowhere do they state that they ultimately collect $425 per hour from these

---

[10] While Mraz concedes that the declarations do not discuss fees actually paid by similarly situated clients to equivalent attorneys in corresponding matters, the range of rates paid in this district to litigators across various skill levels, or the similarity of either the client or the litigators in any corresponding cases—which the Eleventh Circuit suggests is necessary for opinion testimony about fees to have any value, *see Norman*, 836 F.2d at 1299—he apparently submitted the declarations anyway based on the belief that generic references to low supply and high demand would somehow guide the Court toward the figure necessary to induce an attorney to take on this case. (Doc. 54, p. 4). But with no figures from or comparisons to fee-paying relationships between client and counsel in other cases, the declarations do not supply any market-based evidence to inform the lodestar analysis. They are almost pointless.

clients (with no write-offs for otherwise billable time), nor do they mention whether these hourly-fee arrangements were made with institutional or corporate clients rather than consumers; involved stages of litigation such as trial or appeal that did not occur in this matter; or occurred in practice areas like bankruptcy or foreclosure defense rather than an FDCPA case. Likewise, the reference to receiving $425 per hour when they settle cases (Doc. 75, ¶ 5) also fails to provide any market-rate data because a settling defendant paying a plaintiff's attorney fee gives scant attention to the hourly rate so long as the overall amount is agreeable. In sum, outside of the biographical details about Mraz's counsel and references that speak to their reputation, the declarations filed in support of the renewed fee-and-cost motion are of no value for interpolating a market rate.

Just as unhelpful is the declaration of attorney Ernest Kohlmyer that ICS supplied in opposition. (Doc. 101-1). Kohlmyer testifies he has litigated "in excess of 5,000 consumer law cases" since 1991, with the "overwhelming majority" involving the FDCPA and other state and federal statutes often at issue in debt-collection cases. (Doc. 101-1, pp. 2-3). Characterizing this action as a simple one, Kohlmyer opines that $300 is a reasonable hourly rate for Fineman, and $275 is a reasonable rate for LoTempio. (Doc. 101-1, pp. 8-9).

But like the Viles, Alaimo, and Webb declarations supplied by Mraz, Kohlmyer's opinions are not supported by, nor does his declaration provide, any

evidence about fees actually billed and paid in similar cases or any other market-based, hourly-fee-relationship data. Instead, doing nothing more than what any litigant or the Court could readily do, Kohlmeyer merely cites several FDCPA fee awards—all but one of which by this Court—entered in recent years. (Doc. 101-1, pp. 6-7). And as the Eleventh Circuit explained in *Norman*, information about court awards might have been relevant under *Johnson*, "but under the lodestar approach it is not." 836 F.2d at 1304. "For example, there is no assurance that the attorneys in those cases possessed similar skill, experience or reputation or that the case or clients were similar to the one at bar. Further, … there is no evidence that the prevailing market rates in [their respective venues] are the same as in [Fort Myers]." *Id*. at 1305-1305.

The only other information supplied by the parties in support of their hourly-rate arguments is Mraz's submission of the 2015-2016 "Attorney Fee Survey Report" by Ohio attorney Ronald L. Burdge. (Doc. 71-4). But neither Mraz nor the report itself demonstrate this survey comes anywhere close to adhering to *Norman*'s guidelines for interpolating market rates. First and foremost, there is no indication that this survey "speak[s] to rates actually billed and paid." *Norman*, 836 F.2d at 1299. As the declarations from Mraz's own counsel indicate, consumer law attorneys—which the report purports to survey—almost always work on a contingent-fee basis when handling an FDCPA or similar statutory case for a

plaintiff. And so it is highly unlikely that the rates reported by these survey respondents—to the extent they are related to such cases—reflect rates paid by hourly-fee clients. In other words, they do not show "fees set by the market place." *Norman*, 836 F.2d at 1301.

Moreover, as indicated by both the declarations and the survey report, "consumer law" attorneys typically handle cases in a variety of practice areas, and the figures reported in this survey likely incorporate rates charged to fee-paying clients in bankruptcy, mortgage foreclosure, and other matters dissimilar from the case in hand. In sum, with no reliable comparisons to fee-paying relationships in comparable cases with similar clients and counsel in the same market, Burdge's Attorney Fee Survey Report does not supply the market-based evidence necessary to properly perform a lodestar analysis. *See Norman*, 836 F.2d at 1299, 1304-1305. Consequently, this District has "frequently [found] the Fee Survey Report unhelpful in evaluating the reasonableness of attorney's fees." *Frechette v. Nat'l Credit Sys., Inc.*, No. 8:19-cv-37-T-23JSS, 2020 WL 7408378, *3 (M.D. Fla. Mar. 30, 2020) (collecting cases), *adopted by*, No. 8:19-cv-37-T-23JSS, 2020 WL 7408376 (M.D. Fla. July 7, 2020).[11]

Finally, Mraz's overworked reliance on *Robinson* is misplaced because

---

[11] *See also* Doc. 101, p. 5, n. 26 (collecting many of this Court's decisions rejecting the Fee Survey Report).

*Robinson* suffers from all the same defects discussed above concerning the inadequacy of the evidence presented and improper reasoning. On its surface, *Robinson* shares some similarities with Mraz's case because it involved the same plaintiff counsel and was litigated in the same division of this Court. But even a cursory review of the pleadings reveals that the claims in *Robinson* were more complex both factually and legally, involving not just an FDCPA claim by one plaintiff against one defendant about a single debt-collection letter, but rather, multiple claims by two plaintiffs under different statutes against four defendants about both debt-collection and credit-reporting activities. *Robinson v. Nat'l Cred. Sys., Inc.*, No. 2:17-cv-386-FtM-38CM, 2019 WL 468580, *1 (M.D. Fla. Jan. 22, 2019). Within a year after its initiation, the action concluded by way of plaintiffs' settlements with the three credit-bureau defendants and their acceptance of an offer of judgment for $3,000 from the debt-collector defendant. *Id.*

Fineman and LoTempio then urged the Court to award them fees based on an hourly rate of $425. *Id.* at *4. In support, they submitted declarations from themselves and from local practitioners Marcus Viles and Brian Zinn, and they pointed to the same Attorney Fee Survey Report submitted here. *Id.* at *2. But their request for this hourly rate was fundamentally flawed because it was built around the notion that it should be artificially inflated to make up for the fact that they do not always prevail in these contingent-fee cases. The motion (Case No. 2:17-cv-

00386, Doc. 79, p. 16) and all the declarations in support advanced this justification for the $425 rate (*Id.*, Doc. 80, ¶ 5; Doc. 81, ¶ 4; Doc. 83, ¶ 10; Doc. 84, ¶ 8). And the opponent to the fee motion failed to resist this contention. (Case No. 2:17-cv-00386, Doc. 92, p. 3). But as discussed above, the Supreme Court in *City of Burlington v. Dague*, 505 U.S. 557 (1992), squarely rejected the use of such an inflated rate to account for the contingent nature of the fee.

Furthermore, with the opposition doing nothing to call the utility of the Attorney Fee Survey Report into question (Case No. 2:17-cv-00386, Doc. 92, pp. 7-8), Judge Mirando gave credit to plaintiffs' use of it. *Robinson*, 2019 WL 468580 at *5. But as explained above, using the Fee Survey Report to inform a lodestar analysis is ill advised. *Cf. Norman*, 836 F.2d at 1299, 1304-1305. Finally, Judge Mirando credited the boilerplate declarations offered in support of the fee motion, but just like the declarations here—and contrary to the Eleventh Circuit's guidance in *Norman*, 836 F.2d at 1299—they did not supply any evidence about fees actually billed and paid in similar cases or any other market-based evidence from which the Court could properly arrive at a marketplace rate for the services provided.[12]

In the absence of any objections, Judge Mirando's R&R in *Robinson* became

---

[12] Notably, the circularity that *Dague* cautions against is evident here. 505 U.S. 557, 564 (1992). The declarations prepared and submitted by plaintiff counsel all point to *Robinson* for support, and yet *Robinson* is based on virtually identical declarations prepared by the same plaintiff counsel.

the functional equivalent of a stipulated judgment. 28 U.S.C. § 636(b)(1)(C); Fed.

R. Civ. P. 72(b)(3); *see also Thomas v. Arn*, 474 U.S. 140, 150 (1985) (a district

judge need not review an R&R's "factual or legal conclusions, under a *de novo* or

any other standard, when neither party objects").[13] Mraz may correctly cite the order

adopting the R&R as precedent, but the order obviously has less precedential value

than one in which an R&R is contested and nevertheless adopted. *Cf. Edelman v.*

*Jordan*, 415 U.S. 651, 671 (1974) (reasoning that opinions discussing the merits of

a question "obviously" have more "precedential value" than summary affirmances).

And as discussed above, district court orders are neither binding nor are they

evidence of market rate for a lodestar analysis. For all these reasons, resort to

*Robinson* is unavailing.

Even a court that Mraz characterizes as having cited *Robinson* favorably (Doc.

71, p. 15) was unconvinced. Mraz points to *Puente v. Carmel at the California Club*

*Property Owners Assoc.*, No. 18-21376-cv-Williams/Torres, 2019 WL 3428521

(S.D. Fla. April 17, 2019). But *Puente* neither cited nor followed the hourly-rate

conclusion in *Robinson*. Rather, *Puente* merely cited *Robinson*'s summary of the

range of rates in Florida as presented in the Attorney Fee Survey Report. *Puente*,

---

[13] While the district judge in *Robinson* nevertheless reviewed Judge Mirando's legal conclusions de novo, the fee opponent in *Robinson*, as previously mentioned, failed to (1) contest the inflation of the hourly rate based on the contingent nature of the fee, (2) call into question the use of the Attorney Fee Survey Report, and (3) fully discuss how the fee proponent's declarations did not comport with *Norman*.

23

2019 WL 3428521 at *4. And even though *Puente* was litigated in Miami—a more expensive market than Fort Myers—the court arrived at $375 as a reasonable rate in an FDCPA case for an attorney with fourteen years' experience. *Id*. at *3-4. Thus, if *Puente* serves any purpose, it tends to point us in the direction of something less than $375 for Fineman and LoTempio.

With all that said, the salient question is this: "What would a lawyer in this division collect from a fee-paying client per hour for providing representation comparable to the skill, expertise, and reputation brought to the table in this particular case?" And with virtually nothing in the way of reliable market data from the parties, the Court must draw upon "its own knowledge and experience concerning reasonable and proper fees [to] form an independent judgment … without the aid of witnesses as to value." *Norman*, 836 F.2d at 1303. This is just as it was six years ago when the Court was faced with an FDCPA fee application from the same plaintiff counsel in *Hurst v. Seterus, Inc.*, No. 2:15-cv-4-FtM-29CM, 2015 WL 3915562 (M.D. Fla. June 25, 2015).

In *Hurst*, the plaintiff brought FDCPA and corresponding state-law claims against two debt collectors concerning several allegedly wrongful acts related to the servicing of a residential mortgage. *Hurst*, 2015 WL 3915562 at *1. Less than two months after filing its answer, one of the debt collectors served a Rule 68 offer of judgment for $2,001 plus reasonable fees and costs, which the plaintiff accepted.

*Hurst*, No. 2:15-cv-4-FtM-29CM, Doc. 20 (M.D. Fla. Mar. 16, 2015). Finding the requested hourly rates unsubstantiated, the Court relied on its own expertise, assessed the skill and experience that Fineman brought to the case, and determined that $300 was a reasonable hourly rate.[14] *Hurst*, 2015 WL 3915562 at *1. And overall, the Court awarded $2,335 for fees and $465 for costs.

Here, the market rates for the services provided are higher not only due to the passage of time, but because plaintiff counsel's services reflected a higher level of skill, experience, and acumen. This case involved a greater degree of complexity and an aggressive and difficult[15] defendant, with dueling Rule 11 motions and then cross motions for summary judgment concerning unsettled issues of statutory interpretation. Meeting the challenge, plaintiff counsel secured an excellent result for their client. The maximum statutory damages award of $1,000[16] is reserved for the most egregious cases involving a sustained pattern of harassment,[17] and it would

---

[14] An across-the-board reduction of 30% was applied to LoTempio's fee request because neither the rate nor the hours were sufficiently documented. But it appears the Court implicitly accepted $250 as a reasonable hourly rate for LoTempio's services. *Hurst*, 2015 WL 3915562 at *1.

[15] *See*, *e.g.*, Doc. 46, pp. 4-5.

[16] As expressly stated in the FDCPA, a court may award a maximum amount of $1,000 in statutory damages per civil action, not per violation. *See* 15 U.S.C. § 1692k(a)(2)(A); *Harper v. Better Business Servs., Inc.*, 961 F.2d 1561, 1563 (11th Cir. 1992).

[17] *See*, *e.g.*, *Johnson v. Critical Resolution Mediation LLC*, No. 3:16-cv-632-J-34MCR, 2017 WL 2590007, *6 (M.D. Fla. Apr. 24, 2017) (finding FDCPA plaintiff entitled to $1,000 in statutory damages because defendant "made multiple, persistent phone calls" to collect a debt, and "asked Plaintiff to reveal sensitive confidential information without disclosing its identity or the nature of the calls despite being requested to do so, told Plaintiff that she had committed a crime by not

25

have been well within the province of a jury to award $1 had this matter gone to trial,[18] and yet LoTempio and Fineman obtained a judgment for $1,001 (Doc. 39) based on nothing more than ICS having sent a boilerplate debt-collection letter (Doc. 1-4).[19] In other words, plaintiff counsel arguably obtained a result many times over what most juries would have awarded at trial.

Accordingly, drawing from its familiarity with these and other consumer law attorneys who have come before it, and its expertise concerning the market value of the services they provide, the Court should conclude that $340[20] is a reasonable hourly rate for the services provided by LoTempio and Fineman in this case, and that $390 is a reasonable rate for the services provided by Dellutri (which was mostly comprised of providing feedback and guidance to his colleagues). With nearly thirty

---

repaying her alleged debt, and threatened to show up (or have law enforcement show up) at Plaintiff's residential address"), *adopted by*, 2017 WL 2578705 (M.D. Fla. June 14, 2017); *see also Alston v. Summit Receivables*, No. 6:17-cv-1723-Orl-31DCI, 2018 WL 3448595 (M.D. Fla. June 27, 2018) (refusing to grant default judgment for the maximum statutory amount and awarding $750 instead because while the defendant's conduct involved multiple contacts and was certainly intimidating, there was a dearth of evidence about its frequency), *adopted by*, 2018 WL 3436789 (M.D. Fla. July 17, 2018).

[18] *See, e.g., Thornton v. Wolpoff & Abramson, L.L.P.*, 312 F. App'x 161, 163-164 (11th Cir. 2008) (jury awarded FDCPA plaintiff only $1).

[19] Given the unlikelihood that either a court or jury would (or could) award $1,000 in statutory damages for this conduct, it is difficult to accept ICS's argument that Mraz only obtained $1 for his actual damages. On the facts presented, it seems reasonable to view the $1,001 judgment in Mraz's favor as composed of roughly equal parts of statutory and actual damages.

[20] "An attorney who expects to be compensated under [a federal fee-shifting statute] presumably understands that payment of fees will generally not come until the end of the case, if at all." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 556 (2010). Compensation for this delay is generally made by basing the award on current rates or by making an adjustment to reflect present value. *Id.*

years of experience as a board-certified litigator, court-certified mediator, and qualified arbitrator, and as the only named partner of a well-established firm, Dellutri brought a higher degree of skill, experience, and reputation to this matter than his colleagues. A differential in the hourly rate between Dellutri and his colleagues is both appropriate and necessary to reflect what a fee-paying client would pay in this market for similar services.

But a differential between the hourly rates for Fineman and LoTempio does not seem warranted for this case. While Fineman has more overall experience as an attorney, LoTempio specializes in this area of law. Based on the skill, experience, and reputation they each brought to the case, a fee-paying client would find their services of equal value. While it should go without saying given the discussion above, these rates are both client and case specific. For instance, the Court may find lower rates are reasonable for the same attorneys in similar matters that—in stark contrast to what happened here—are amicably resolved at the pleading stage and without discovery and motion practice. And the Court may find higher rates are reasonable for the same attorneys in similar matters when skill and experience not involved here—such as trial, appellate, or class action work—are involved.

While some reluctance to cite other FDCPA fee awards by this District may be warranted, to avoid feeding the all too prevalent misimpression that prior court awards can serve as evidence of market rates (which they do not, *see Norman*, 836

F.2d at 1304), it seems worth noting that several recent efforts by the Court to discern appropriate market rates in similar cases tend to confirm the hourly rates found reasonable for this matter.

For instance, here in Fort Myers, the Court recently arrived at an hourly rate of $300 for an attorney handling a case with an FDCPA claim. *Mendoza v. Cap. Accts., LLC*, No. 2:19-cv-824-FtM-29MRM, 2020 WL 2487854 (M.D. Fla. May 14, 2020). While the complaint was a bit more complex both factually and legally given the multiple statutory claims at issue, the defendant did not appear or defend, and a default judgment for $19,000 was quickly entered. *Id*. at *1-4. And while there was no discovery or adversary motion practice, an apparently excellent result was obtained. Further, the attorney had a few less years of experience than either LoTempio or Fineman. *Mendoza*, No. 2:19-cv-824-FtM-29MRM (motion for default judgment at Doc. 12, ¶ 11, filed Mar. 18, 2020).[21]

In Tampa, the Court recently granted FDCPA fee awards in *McCray v. Dietsch & Wright, P.A.*, No. 8:18-cv-731-T-02SPF, 2020 WL 6565078 (M.D. Fla. Nov. 9, 2020), and *Frechette v. Nat'l Credit Sys., Inc.*, No. 8:19-cv-37-T-23JSS,

---

[21] The fee application in *Mendoza* indicates that the Attorney Fee Survey Report supplied by Mraz is not only unreliable but out of date. While Mraz supplied a 2015-2016 version, Mendoza cited the 2017-2018 copy. And while Mraz represented that the survey found a median rate of $400 for consumer lawyers in this area (Doc. 71, p. 15), Mendoza represented that this median was $350 (*Mendoza*, Doc. 12, ¶ 11). Consistent with the reasoning in this R&R, the Court did not rely on the Attorney Fee Survey Report when arriving at a market rate for the fee award in *Mendoza*. 2020 WL 2487854 at *4.

2020 WL 7408378 (M.D. Fla. Mar. 30, 2020), *adopted by*, No. 8:19-cv-37-T-23JSS, 2020 WL 7408376 (M.D. Fla. July 7, 2020). *McCray* involved an FDCPA class action that was resolved when an offer of judgment for $11,000 was accepted for both the class and the named plaintiff. *McCray*, 2020 WL 6565078 at *1. It was a "straightforward case" in which "the skill of plaintiff's counsel was not tested or put on display." *Id*. at *2. So, the Court found that $350 was a reasonable hourly rate for an attorney with twenty years' experience, and that $300 was reasonable for those with ten years or fewer. *Id*.

*Frechettte* involved FDCPA and other statutory claims against multiple defendants. 2020 WL 7408378 at *1. At least at the pleading stage, it was more complex than the case at bar. But it was resolved within six months at mediation. *Id*. Observing that it, too, "was a straightforward case," the Court found that $300 was a reasonable hourly rate for an attorney with just over five years' experience. *Id*. at *3-4.

And in Orlando, a relatively recent FDCPA fee award was granted in *Sandler v. Michael Maxwell Grp., LLC*, No. 6:19-cv-1688-Orl-41GJK, 2019 WL 7461690 (M.D. Fla. Dec. 13, 2019), *adopted by*, No. 6:19-cv-1688-Orl-41GJK, 2020 WL 42867 (M.D. Fla. Jan. 3, 2020). Like *Mendoza*, *Sandler* was an FDCPA case that concluded with a default judgment, but only $2,000 in statutory damages was awarded. *Sandler*, 2019 WL 7461690 at *4. There was "nothing novel or difficult"

about the case, "and it did not require an attorney of great skill." *Id*. at *5. Further, the work product of plaintiff counsel was apparently subpar. *Id*. With those considerations, the Court arrived at an hourly rate of $275. *Id*.

Incorporating adjustments (both upward and downward) between these four recent cases and the one present here to account for differences in the levels of skill and service provided as well as market variation, hourly rates of $340 for LoTempio and Fineman and $390 for Dellutri appear to fall squarely in line with the Court's recent estimations of market rates for attorneys in FDCPA cases.

Mraz also requests an hourly rate of $150 for paralegal Kathy Michie, who has 22 years of experience. (Doc. 71, pp. 3, 16; Doc. 74). Based on the same expertise and reasoning discussed earlier, $115 is a reasonable hourly rate for her services in this matter. This is in line with the market-rate conclusions made by this Court for paralegal services in similar cases. *McCray v. Dietsch & Wright, P.A.*, No. 8:18-cv-731-T-02SPF, 2020 WL 6565078, *2 (M.D. Fla. Nov. 9, 2020) (finding hourly rate of $100 reasonable in Tampa for paralegals with less than 25 years' experience in a straightforward FDCPA case); *Proescher v. Sec. Collection Agency*, No. 3:17-cv-1052-J-32PDB, 2018 WL 3432737, *11 (M.D. Fla. June 8, 2018), *adopted by*, 2018 WL 3428157 (M.D. Fla. July 16, 2018) (finding hourly rate of $125 reasonable for paralegal in Jacksonville with over 27 years of experience).

## B.    Reasonable number of hours

The second step in computing the lodestar is determining the reasonable number of hours expended. "Time spent is reasonable, and thus compensable, if it would be proper to charge the time to a client." *In re Home Depot Inc.*, 931 F.3d 1065, 1087 (11th Cir. 2019).[22]  Since it is "the duty of the courts to see that excessive fees and expenses are not awarded," the fee applicant's timesheets must be viewed from the perspective of a cost-sensitive client, and if such a client would refuse to authorize the work or balk at certain entries, and justifiably so, then they should not be awarded. *ACLU of Ga. v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999). In other words, fee applicants must exercise "billing judgment" and exclude hours "that would be unreasonable to bill to a client and therefore to one's adversary *irrespective of the skill, reputation or experience of counsel*." *Id*. (quoting *Norman*, 836 F.2d at 1301 (emphasis in original)). "When a district court finds the number of hours claimed is unreasonably high, the court has two choices: it may conduct an hour-by-hour analysis or it may reduce the requested hours with an across-the-board cut." *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008).

"'[O]bjections and proof from fee opponents' concerning hours that should be excluded must be specific and 'reasonably precise.'" *Barnes*, 168 F.3d at 428

---

[22] It does not go unnoticed from a review of the declarations that Dellutri and Fineman devoted more hours to this litigation than they logged on their timesheets, and that the fee application omits other items from the timesheets (such as redacted time entries).

(quoting *Norman*, 836 F.2d at 1301). Consequently, "a fee opponent's failure to explain exactly which hours he views as unnecessary or duplicative is generally viewed as fatal," and therefore, "all hours to which the [fee opponents] have not made an objection will be accepted." *Wales v. Jack M. Berry, Inc.*, 192 F. Supp. 2d 1313, 1320 (M.D. Fla. 2001). Here, ICS raised objections, which were specific and directed at particular entries.

### 1. *Mraz's opposition to ICS's post-judgment motion to dismiss*

ICS argues that plaintiff counsel seek an excessive number of hours for their response brief and sur-reply in opposition to ICS's motion to dismiss. ICS believes 92.8 hours are requested for these items (Doc. 101, p. 13), but an examination of the timesheet reveals that only 54.2 hours were logged for this work (Doc. 72-1, pp. 5-6). Nevertheless, ICS makes a valid point about the response. It was filed eight days after plaintiff counsel filed their *Trichell* brief in *Lamirand v. Fay Servicing, LLC*, No. 2:20-cv-138-FtM-38MRM (Doc. 30, filed July 20, 2020), and much of its standing discussion is copy and pasted from it; so much so that the response filed in this matter refers to the defendant as "Fay." (Doc. 58, p. 11). ICS seeks a 70% reduction of these hours, but that would go too far. In fact, it appears the lion's share of time related to this filing was related to developing the argument that ICS's motion to dismiss was precluded by Mraz's acceptance of the Rule 68 offer of

judgment. Nevertheless, the 27.9 hours[23] sought for preparing the response is excessive and should be reduced by 30%.

As for the sur-reply, while it appears to stand unique from anything filed in *Lamirand*, after a careful review of both the reply and the sur-reply, the 26.3 hours[24] that LoTempio logged for preparing and filing the sur-reply are excessive and should be reduced by 15%.

### 2. Mraz's opposition to ICS's motion for reconsideration

After the Court refused to dismiss this matter, ICS filed an eleven-page motion for reconsideration, which mostly hinged on a single case. (Doc. 86). In response, Mraz filed a fifteen-page opposition. (Doc. 88). Again, ICS miscalculates the number of hours at issue—believing that plaintiff counsel seek 31.5 hours for this item. But on review of their timesheets, only 17.2 hours should be considered at issue. (Doc. 92-1).[25] ICS argues the time spent preparing Mraz's opposition was excessive and requests a 50% reduction. (Doc. 101, pp. 13-14). The opposition devoted a substantial number of pages to complaining about the procedural history

---

[23] These hours were entered from 7-15-20 through 7-28-20 (Doc. 72-1, p. 5).

[24] The relevant time entries include: 0.1 on 7-30-2020; 0.3 on 7-31-2020; both entries from 8-3-2020; and the last 0.1 entry from 8-6-2020 through and including the entry on 8-19-2020. (Doc. 72-1, pp. 5-6).

[25] The relevant time entries include: 0.4 on 10-21-2020; 0.2 on 10-28-2020; 0.1, 2.1, and 0.3 on 11-18-2020; all entries from 11-19-2020; 3.4 on 11-23-2020; 0.2 on 11-24-2020; all entries from 12-1-2020 through 12-2-2020; and 0.1 on 12-4-2020. (Doc. 92-1).

of this case and waxing on about the applicable legal standard; much of it unnecessary and certainly excessive. Accordingly, a 20% reduction is appropriate.

### 3. *Mraz's section 1927 motion for sanctions*

LoTempio reports he spent 35 hours[26] working on the section 1927 motion.[27] (Doc. 92-1). ICS argues LoTempio should not be awarded any time for preparing this motion, and the Court should agree. (Doc. 101, p. 14). Not only did this motion lack merit, but the relief requested was entirely duplicative of the fee request and undermined Mraz's request for fees. No reasonably prudent, cost-conscious client interested in securing the greatest possible fee award would have authorized this undertaking. None of these hours should be allowed.

### 4. *Papers not filed with, or otherwise stricken by, the court*

A Rule 11 motion is rarely warranted, and yet ICS set a fight-you-tooth-and-nail tone almost from the start by serving one on October 31, 2018, and demanding the dismissal of this suit. (Doc. 71-1, pp. 1-16). Since ICS opted not to file the Rule 11 motion—for good reason, given the judgment entered in Mraz's favor—it argues

---

[26] The relevant time entries include: 0.2 on 7-30-2020; 2.7, 0.1, and 1.7 on 7-31-2020; 0.3 on 8-6-2020; 1.7 on 8-27-2020; 1.0 and 0.4 on 10-21-2020; 1.5 on 10-23-2020; 3.9 on 11-18-2020; 2.4 on 11-20-2020; both entries from 12-3-2020; 2.0 on 12-4-2020; and all entries from 12-7-2020 through 12-9-2020. (Doc. 72-1, pp. 5-6; Doc. 92-1).

[27] At first, this work took the form of preparing a Rule 11 motion directed to the post-judgment motion to dismiss, and then it morphed into preparing and filing the section 1927 motion. All entries after the filing of the July 14, 2020 motion to dismiss that reference Rule 11 or 1927 sanctions are included in this discussion and should be disallowed. (Doc. 72-1, p. 5; Doc. 92-1).

the five-hour entry on November 7, 2018 (Doc. 72-1, p. 3), for preparing a response should not be allowed. (Doc. 101, pp. 23-24). If ICS did not want to face the prospect of being held accountable for plaintiff counsel's time responding to the Rule 11 motion, then it should not have served it. This objection should be overruled.

Much the same can be said for a motion to compel that Mraz never filed. ICS claims LoTempio should not have devoted four hours toward preparing the motion to compel because the parties had resolved the issues concerning ICS's discovery responses some two weeks prior. (Doc. 101, p. 23). But LoTempio explained that by agreement, ICS's amended responses were due October 4. (Doc. 56, p. 6). None were forthcoming, and ICS did not ask for an extension of time. So, the next day, LoTempio began drafting the motion to compel. (Doc. 56, p. 7). This objection should likewise be overruled.

But ICS's third objection in this series has merit. ICS objects to the hours related to a belated attempt by Mraz's counsel to file an amended motion for summary judgment that ended up stricken from the record and not considered by the Court. (Doc. 101, p. 24). As the Court explained when striking the amended motion (Doc. 29), it was filed two weeks after the dispositive-motion deadline without any request for leave to amend or an explanation why the Court should consider the untimely motion. A cost-conscious client would likely refuse payment for these fees

and have good cause to do so. Thus, it would be inappropriate to tax the client's adversary for them. These 11.2 hours should be disallowed.[28]

### 5. *Clerical Tasks*

ICS objects to the hours devoted to clerical tasks, and to some extent this objection has merit. (Doc. 101, pp. 20-22). Here, 1.2 hours of LoTempio's time was clerical in nature.[29] Furthermore, paralegal Michie's time[30] was non-compensable except for the 1.45 hours of entries on April 20, September 13, and December 4 through 6 in 2018; the 1.2 hours of entries on January 8, January 10, and April 15 through 30 in 2019; and the .65 hours of entries on April 14 and 15 in 2020.

### 6. *Block billing*

ICS characterizes a smattering of time entries by LoTempio as "block billing" and argues a 50% reduction should be applied to them because one cannot discern how much time was devoted to each discrete task listed within a single time entry.

---

[28] Between 6-21-19, and 7-24-19, LoTempio devoted 10.9 hours and Michie devoted .3 hours to this work. (Doc. 72-1, pp. 4, 7). The .3 hours Michie devoted to the amended summary judgment motion were also clerical in nature and should be excluded for that reason as well, as discussed in the next section of this report.

[29] ICS identifies thirteen of LoTempio's entries as clerical, but the work described in the entries on November 14, 19, and 27 appear reasonable for an attorney to handle. (Doc. 101, pp. 20-21). And the entry on April 19, 2018, was only billed for 0.1 hours (Doc. 72-1, p. 2), and not 0.2 hours as ICS claims (Doc. 101, p. 20).

[30] A court may "only award fees for the work of a paralegal when the work is of a legal nature, traditionally performed by attorneys." *Fed. Trade Comm'n v. Life Mgmt. Servs. of Orange Cty., LLC*, No. 6:16-cv-982-Orl-41TBS, 2017 WL 2869535, *3 (M.D. Fla. June 12, 2017), *adopted by*, No. 6:16-cv-982-Orl-41TBS, 2017 WL 4877460 (M.D. Fla. Oct. 30, 2017) (collecting cases).

(Doc. 101, pp. 18-20). But block billing is not problematic so long as the listed tasks are compensable and the overall number of hours for the time entry is reasonable. *Prison Legal News v. Inch*, 411 F. Supp. 3d 1198, 1215 (N.D. Fla. 2019) (finding block billed entries "are compensable because the entries contain enough detail to enable this Court to ascertain the work performed and because the amount of time expended on the tasks was reasonable"); *Guetzloe Group, Inc. v. Mask*, No. 6:06-CV-404ORL22JGG, 2007 WL 2479335, *3 (M.D. Fla. Aug. 28, 2007) (declining to reduce fees because, "[a]lthough block billing was employed, the time appears reasonable for the tasks described"). Further, clients often prefer block billing both for ease of review and because minimizing the use of .1 and .2 time entries can reduce the overall amount due. For arriving at an appropriate fee award, block billing becomes problematic when a single time entry includes both compensable and non-compensable tasks. Two such entries occurred here, and so the entire time entries should be disallowed.[31] Otherwise, the block-bill entries are adequately described and reasonable in amount.

---

[31] There is a block-time entry on 11-18-20, with 3.9 hours devoted to both opposing the motion for reconsideration and preparing the section 1927 motion for sanctions. Since it cannot be sensibly apportioned, this entry is treated as wholly devoted to the 1927 motion. (Doc. 92-1). The same analysis applies to the 0.4 hours billed on 10-21-20. (Doc. 92-1). Both entries are excluded because no time for the 1927 sanctions work is compensable.

### 7. *ICS's request for an across-the-board reduction of 60%*

As ICS would have it, plaintiffs should incur a penalty in the way of an across-the-board reduction to the lodestar amount whenever they agree to settle a case for anything less than the full scope of potential damages. (Doc. 101, pp. 14-17, 25). Naturally, to avoid disincentivizing resolution short of trial, the Court should be loath to entertain such a proposition.

Had ICS served its Rule 68 offer of judgment much earlier in the case, the amount of the fee award would be an entirely different story. Fees following the rejection of a settlement offer that do not yield a better result can be disallowed. *See Thornton v. Wolpoff & Abramson, L.L.P.*, 312 F. App'x 161, 163-165 (11th Cir. 2008) (affirming 85% reduction of lodestar in FDCPA case because the defendant offered $3,500 early in the litigation and the jury awarded only $1). But ICS chose instead to first put Mraz through the gauntlet of discovery and dispositive motion practice, and to then make multiple runs at vacating the consent judgment. *Cf. McGowan v. King, Inc.*, 661 F. 2d 48, 51 (5th Cir. 1981) ("[Plaintiff] counsel did not inflate this small case into a large one; its protraction resulted from the stalwart defense. And although defendants are not required to yield an inch or to pay a dime

not due, they may by militant resistance increase the exertions required of their opponents and thus, if unsuccessful, be required to bear that cost.").[32]

Moreover, ICS's attempt to portray Mraz as having only obtained limited success is unconvincing. (Doc. 101, pp. 14-17). His aggressive and difficult adversary threatened him with sanctions if he did not dismiss this suit. He continued to press his case, prevailed on his theories of recovery, overcame his opponent's defenses—even post-judgment—and now has a judgment in his favor comprised of a substantial amount of both statutory and actual damages. Because this suit arose from nothing more than the transmission of a boilerplate debt-collection letter, it is difficult to imagine that Mraz sees the award of $1,001 in damages as anything less than phenomenal.

The lodestar is entitled to a strong presumption that it yields an appropriate award, and ICS has failed to meet the high bar of demonstrating that any departure from the lodestar is warranted. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551-552 (2010). ICS's request for a downward departure of 60% from the lodestar should be rejected.[33]

---

[32] *See also State Farm Fire and Cas. Co. v. Palma*, 524 So. 2d 1035 (Fla. 4th DCA 1988), (upholding an attorneys' fees award of $253,500 for success in collecting a $600 medical bill), *aff'd*, 555 So. 2d 836 (Fla. 1990). The decision was supported in part because the insurer decided to "go to the mat" in litigation. *Palma*, 524 So. 2d at 1036. "Having chosen to stand and fight over this charge, [the insurer], of course, made a business judgment for which it should have known a day of reckoning would come should it lose in the end." *Id.*

[33] *Cf. Armstrong v. Rose L. Firm, P.A.*, No. CIV. 00-2287MJD/SRN, 2002 WL 31050583, *5 (D.

Accordingly, the Court should arrive at a lodestar amount of $72,651.50 as detailed in the following table:

| Name | Hourly Rate | Number of Hours | Total |
|---|---|---|---|
| Joseph LoTempio | $340.00 | 205.7[34] | $69,938 |
| David Fineman | $340.00 | 4.8 | $1,632 |
| Carmen Dellutri | $390.00 | 1.8 | $702 |
| Kathy Michie | $115.00 | 3.3 | $379.50 |
| | | Lodestar: | $72,651.50 |

Plaintiff is also entitled to costs of $1,366.79, which is undisputed.

## V.   Conclusion

By federal statute, "Interest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). "Interest shall be computed daily to the date of payment ... and shall be compounded annually." *Id*. § 1961(b). Interest is calculated "from the date of the entry of the judgment, at a rate equal to

---

Minn. Sept. 5, 2002) (rejecting downward departure from fee award in excess of $40,000 when only $1,000 in FDCPA statutory damages were recovered; reasoning: "While [the fees] far exceed the statutory damage award in the present case, Plaintiff did not choose to create this disparity. Defendant aggressively defended this case, as was its right. … This defense produced a large amount of litigation, and significantly increased the number of hours Plaintiff's attorney committed to this case.").

[34] LoTempio logged 268.50 hours (221.80 + 46.70) as indicated in his timesheets (Doc. 72-1, p. 6; Doc. 92-1, p. 2). Subtracted from this amount is 8.4 hours and 3.9 hours (subsection 1), 3.4 hours (subsection 2), 35 hours (subsection 3), 10.9 hours (subsection 4), and 1.2 hours (subsection 5), which comes out to 205.7 billable hours.

the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the judgment." 28 U.S.C. § 1961(a).

Under this statute, post-judgment interest is mandatory. *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1053 (11th Cir. 1994). And because the original judgment entered on September 5, 2019, included Mraz's unconditional entitlement to fees and costs by statute (Docs. 37, 39), the fee-and-cost award bears interest from that date. *See Sanford v. Omni Hotels Management Corp.*, No. 3:16-cv-1578-J-34PDB, 2020 WL 5260191, *19-20 (M.D. Fla. Aug. 19, 2020).

Accordingly, it is **Respectfully Recommended**:

1. Plaintiff's Request for Judicial Notice (Doc. 82) be **DENIED**.

2. Plaintiff's Motion for Sanctions Pursuant to 28 U.S.C. § 1927 (Doc. 96) be **DENIED**.

3. Plaintiff's Renewed Motion for Costs and Attorneys' Fees (Doc. 71) be **GRANTED in part** and **DENIED in part**.

4. The **Clerk** be directed to amend the judgment in favor of Plaintiff and against Defendant to award fees in the amount of $72,651.50, and costs in the amount of $1,366.79, and specifying that the fees and costs bear post-judgment interest under 28 U.S.C. § 1961(a) from September 5, 2019, until

paid.

Reported in Fort Myers, Florida on August 23, 2021.

_Nicholas P. Mizell_
NICHOLAS P. MIZELL
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections forfeits that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1. **To expedite resolution, parties may file a joint notice waiving the 14-day objection period.**